Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:              )
                               )   File No. FL-03841-A
MOBILE VAULT, INC.             )

WITNESS:   Jeffrey Lamson

PAGES:     1 through 235

PLACE:     Securities and Exchange Commission
           San Francisco Regional Office
           44 Montgomery Street, Suite 2800
           Testimony Room - Powell
           San Francisco, California 94104

DATE:      Tuesday, June 10, 2014

The above-entitled matter came on for hearing, pursuant to notice, at 11:43 a.m.


EXHIBIT F

Diversified Reporting Services, Inc.

(202) 467-9200

Page 2

| 1 | APPEARANCES: |
|---|---|
| 2 | |
| 3 | On behalf of the Securities and Exchange Commission: |
| 4 | JEFFREY T. COOK, ESQ. |
| 5 | Securities and Exchange Commission |
| 6 | Miami Regional office |
| 7 | 801 Brickell Avenue, 18th Floor |
| 8 | Miami, Florida 33131 |
| 9 | (305) 982-6344 |
| 10 | |
| 11 | On behalf of the Witness: |
| 12 | JEFFREY LAMSON, PRO SE |
| 13 | |
| 14 | ALSO PRESENT: |
| 15 | ANDREW DICOMO, Intern |

Page 3

CONTENTS

| | WITNESS: | EXAMINATION: |
|---|---|---|
| | Jeffrey Lamson | 7 |

| | EXHIBITS: | DESCRIPTION: | IDENTIFIED |
|---|---|---|---|
| | 385 | SEC Letter to Jeff Lamson dated 4-11-14 | 11 |
| | 386 | Daniel McKelvey E-mail, 10-5-11 [MBN 015140-0002390 - MBN 015140-0002394] | 26 |
| | 387 | Entertainment Art, Inc., Unanimous Written Consent of the Board of Directors | 34 |
| | 388 | Form 8-K, Entertainment Art, Inc. (4-page document) | 39 |
| | 389 | XFINITY Connect, FW: eert, From: Jeff <lamson@fortepartners.com (1-page document)[SEC-JLamson-P-0000105] | 44 |
| | 390 | Form 10-Q Entertainment Art, Inc. | 46 |
| | 391 | Entertainment Art, Inc. Letter to Wolinetz, Lafazan & Company, P.C. | 52 |
| | 392 | Form 8-K/A (Amendment No. 1) Current Report, Entertainment Art, Inc. | 54 |

Page 4

CONTENTS (CONT.)

| EXHIBITS: | DESCRIPTION: | IDENTIFIED: |
|---|---|---|
| 393 | Entertainment Art, Inc. Letter to Schneider, Weinberger & Beilly, LLP, dated May 31, 2012 [ART0027 - ART0028] | 55 |
| 394 | Form 10-K/A, Amendment No. 1, Entertainment Art, Inc. | 57 |
| 395 | Entertainment Art, Inc. Debenture (3-page document) | 64 |
| 396 | Jeff Lamson E-mail (10-19-12), To: Jim Schneider [ART0015 - ART0017] | 67 |
| 397 | Jeff Lamson E-mail (6-22-10) | 94 |
| 398 | E-mail From: Jeff (6-2-11) | 99 |
| 399 | Jeff Lamson E-mail (6-2-10) | 108 |
| 400 | Daniel McKelvey E-mail (7-21-10), To: Steven Sanders | 123 |
| 401 | XFINITY Connect Jeff Lamson E-mail | 131 |
| 402 | EDGARbiz@aol.com E-mail (2-8-11), To: mckelvey@fortepartners.com | 142 |
| 403 | E-mail From: Jeff (5-2-11), To: mckelvey@fortepartners.com [Forte Capital 17128, and attachments] | 144 |

Page 5

CONTENTS (CONT.)

| EXHIBITS: | DESCRIPTION: | IDENTIFIED: |
|---|---|---|
| 404 | Daniel McKelvey E-mail (6-22-11), To: jahearn@streettransfer.com | 159 |
| 405 | Columbia Financial Printing Corp., Signature Page, Corporate Name: | 160 |
| 406 | E-mail From: Jeff (5-24-11) | 162 |
| 407 | Minutes of Meeting of Directors of BLUEFLASH COMMUNICATIONS, INC. | 164 |
| 408 | Daniel McKelvey E-mail (11-1-12) | 165 |
| 409 | BlueFlash Communications Letter to Mr. Jeff Lamson, dated October 30, 2012 | 174 |
| 410 | Daniel McKelvey E-mail (2-7-11), To: | 175 |
| 411 | Steve Sanders E-mail (2-17-11) | 179 |
| 412 | Steve Sanders E-mail (3-17-11) | 183 |
| 413 | Jake Owens E-mail (6-30-13) | 187 |
| 414 | Jack Owens E-mail (7-3-13) | 189 |
| 415 | J. Lamson E-mail (4-30-13) | 206 |
| 416 | Daniel McKelvey E-mail (4-17-13), To: J. Lamson [SEC-JLamson-P-0000115] | 207 |

## Page 6

C O N T E N T S (CONT.)

| | EXHIBITS: DESCRIPTION: | IDENTIFIED |
|---|---|---|
| 417 | Mobile Vault, Inc., Reconciliation Detail, Wells, Period Ending 02/28/2013 | 209 |
| 418 | Lisa Lamson, Invoice #2, Date 4/1/2011 | 213 |

## Page 7

1     PROCEEDINGS
2         MR. COOK: We are on the record at approximately
3  11:43 a.m. on June 10, 2014, Eastern Standard Time.
4         My name is Jeffrey Cook. I am a member of the
5  staff of the enforcement division of the Securities and
6  Exchange Commission the SEC. I'm an officer of the
7  Commission for the purposes of this proceeding.
8         Let the record reflect that I'm located in the
9  Miami Regional Office of the U.S. SEC in Miami, Florida,
10 and participating in this proceeding via video
11 conferencing.
12        Mr. Jeffrey Lamson is testifying in this
13 proceeding from the SEC's office in San Francisco,
14 California.
15        I will swear the witness in now.
16        Mr. Lamson, could you please raise your right
17 hand.-
18 Whereupon,
19        JEFFREY LAMSON,
20 was called as a witness and, having been first duly sworn,
21 was examined and testified as follows:
22        THE WITNESS: I do.
23              EXAMINATION
24 BY MR. COOK:
25   Q   If you could please state your full name and

## Page 8

1  spell your name for the record.
2     A   Jeffrey Lawrence Lamson. J-E-F-F-R-E-Y,
3  L-A-W-R-E-N-C-E, L-A-M-S-O-N.
4     Q   Thank you, Mr. Lamson.
5         And as we discussed, with me here is one of our
6  summer interns, Andrew Dicomo.
7         And you stated before that you do not have an
8  objection to Mr. Dicomo observing the testimony today; is
9  that correct?
10    A   That is correct.
11    Q   Thank you very much for that.
12        Mr. Lamson, this is an investigation by the
13 United States Securities and Exchange Commission in the
14 matter of Mobile Vault, Inc., to determine whether there
15 have been violations of certain provisions of the federal
16 security laws. However, the facts developed in this
17 investigation might constitute violations of other federal
18 or state civil or criminal laws.
19        Prior to the opening of the record, you were
20 provided with a copy of the formal order of investigation
21 in this matter, and it will be available for your
22 examination during the course of your testimony today.
23        Mr. Lamson, have you had an opportunity to review
24 the formal order?
25    A   Yes.

## Page 9

1     Q   And do you have any questions with respect to the
2  formal order?
3     A   No.
4     Q   You were also handed a copy, before we went on
5  the record, a document entitled "Commission Supplemental
6  Information Form 1662."
7         BY MR. COOK:
8     Q   Mr. Lamson have you had an opportunity to read
9  that document which had been previously marked as
10 Mobile Vault Exhibit 1?
11    A   Yes.
12    Q   And do you have any questions concerning that
13 document?
14    A   No.
15    Q   Mr. Lamson, are you represented in this matter by
16 counsel?
17    A   No.
18    Q   Mr. Lamson, just to remind you of a few of the
19 rights that are set forth in the Form 1662, you have the
20 right to be accompanied, represented, and advised by
21 counsel. This means that you may have an attorney present
22 and that your attorney can advise you before, during, and
23 after your examination here today.
24        Do you understand this?
25    A   Yes.

Page 178

1  A   I could -- I could hazard a guess, but I don't
2  know the -- you know, I know it's something that gets
3  stamped --
4  Q   Did this --
5  A   It's something that gets stamped at the bank,
6  umm, signing over stocks certificate to somebody else, I
7  think is ...
8  Q   Did Tyler Vorhies ever give you authorization to
9  receive restricted stock certificates with respect
10 BCS Solutions?
11 A   Give me authorization?
12 Q   Yes.
13 A   For me to receive --
14 Q   Yes.
15 A   No, I don't recall that.
16 Q   Did you ever personally receive stock certificate
17 for 12 million shares of BCS Solutions in the name of
18 Tyler Vorhies?
19 A   No, sir.
20 Q   What is the address 2530 Warren Drive, Rocklin,
21 California, 95677?
22 A   I think that may have been where I worked.
23 Q   Did David Johnson ever authorize you to receive a
24 restricted stock certificate in his name for Hidden Ladder
25 stock?

Page 179

1  A   Authorize me to receive -- boy, I -- I don't -- I
2  don't recall getting authorization -- I don't recall
3  receiving any -- I mean, is there -- you're talking about
4  getting a stock certificate in the mail or somebody
5  delivering a stock certificate to me? Is that what -- when
6  you say --
7  Q   Right. Did you ever receive stock certificates
8  for Hidden Ladder or BCS Solutions stock?
9  A   No, I don't think I did.
10     MR. COOK: If I could ask the court reporter to
11 mark what's in Folder 9 as the next exhibit, please.
12     (SEC Exhibit No. 411 was marked
13     for identification.)
14     BY MR. COOK:
15 Q   Mr. Lamson, I've asked the court reporter to mark
16 as the next exhibit, which is 411, it's a one-page e-mail
17 dated February 17th, 2011, and two attachments, pdfs. The
18 Bates numbers are MBN 15136-7002 to '7004.
19     Mr. Lamson, the e-mail is from Steve Sanders to
20 Robert Winterle at StockTrans.
21     Have you ever had dealings with Mr. Winterle or
22 StockTrans?
23 A   No.
24 Q   Have you ever had direct dealings with
25 Steve Sanders?

Page 180

1  A   Like I said, I think I've talked to him one time
2  on the phone in a social manner. I've seen that he's been
3  on e-mails. He's sent me e-mails before, but that's about
4  it.
5  Q   But you testified that it was your understanding
6  that Mr. McKelvey and Mr. Sanders, together, operated these
7  companies, correct?
8  A   Correct.
9  Q   And you see in this e-mail, it says in the second
10 line -- well, first, it says: "Attached are letters from
11 Tyler Vorhies of BCS Solutions, Inc., and from
12 David Johnson of Hidden Ladder asking you to print and send
13 their certificates to Mr. Lamson. Mr. Lamson, is assisting
14 them in getting their certificates Medallion guaranteed."
15     Did you ever offer any assistance to Mr. Vorhies
16 or Mr. Johnson with respect to this issue?
17 A   You know what? If these -- like I said before,
18 if -- what I -- if I did, I was the conduit, meaning that
19 the stock came to me, I then handed it to Davy and/or
20 Tyler, and they went down and got -- went down to the bank
21 and got it guaranteed. I didn't know this letter was going
22 out.
23     He just said -- you know, if -- if it was a
24 discussion, Daniel said, "Hey, I'm going to send the stock
25 to you. These need to be Medallion guaranteed at the bank;

Page 181

1  get them to Tyler and get them to Davy, have them get --
2  have them get it done."
3  Q   If you turn to the two attachments, it's each a
4  one-page letter, one for Mr. Vorhies, one from Mr. Johnson,
5  to StockTrans saying: "Please accept this letter of
6  authorization to mail my BCS Solutions, Inc., Restricted
7  Stock Certificate for 12 million shares to L&H Airco, care
8  of Jeff Lamson."
9      Did you have any involvement in the preparation
10 of this document?
11 A   No.
12 Q   Do you know if Tyler Vorhies signed this document
13 on '7003?
14 A   I -- I don't know that.
15 Q   Do you know if Mr. Johnson signed the document on
16 '7004?
17 A   I -- I don't know that either.
18 Q   Did you have any involvement with the logo for
19 Hidden Ladder that appears on Mr. Johnson's letter?
20 A   I did not.
21 Q   Did Mr. Vorhies or Mr. Johnson ever discuss with
22 you the issue of deliveries of stock certificates?
23 A   No.
24 Q   Did you ever actually receive stock certificates
25 in their name?

Page 182

1  A  I'm assuming I did from these letters, and that I
2  helped them -- or that I delivered them to David and to
3  Tyler and had them go down and get the --the
4  certificate -- whatever -- the certificate Medallion
5  guaranteed, but I don't -- I don't specifically recall.
6  But if you told me that I -- if somebody said that I did, I
7  probably did.
8      Q  Mr. Lamson, did you have any involvement with the
9  CEOs that you recruited around the time of the sale of the
10 shell companies?
11     A  I was just waiting for you to get back.
12     Q  Sorry. I just left a moment?
13     A  If it wasn't -- if it wasn't something like this,
14 umm, I -- I would say no.
15     Q  You stated earlier that you were compensated with
16 respect to your recruitment efforts for the CEOs by
17 receiving a portion of the funds that they received; is
18 that correct?
19     A  Correct.
20     Q  Do you remember how you were paid in connection
21 with Hidden Ladder in this respect?
22     A  I -- I don't recall.
23     Q  Did any of the CEOs send you any checks or other
24 forms of money in connection with the sale of their
25 companies?

Page 183

1   A  No.
2   Q  Do you recall receiving wire transfers from a law
3  firm or anyone else reflecting amounts to be paid to you in
4  connection with your recruitment of CEOs?
5   A  Yeah. That's -- that's the way it was -- that's
6  the way it was done.
7   Q  With respect to Mr. Johnson and Hidden Ladder,
8  when you recruited Mr. Johnson, did you tell him he would
9  be paid $10,000?
10  A  I -- I don't know what I -- I don't know what him
11 and I discussed about that.
12  Q  Do you maintain an account at Bank of the West?
13  A  I don't.
14  Q  Does your wife?
15  A  Yes.
16     MR. COOK:  If I could ask the court reporter to
17 mark as the next exhibit what's in Folder 10, please.
18     (SEC Exhibit No. 412 was marked
19     for identification.)
20     BY MR. COOK:
21  Q  Mr. Lamson, I've asked the court reporter to mark
22 as the next exhibit, Mobile Vault 412. It's a one-page
23 e-mail string with a Bates number MBN 15138-10320. That's
24 an e-mail string dated March 16th and 17th, 2011.
25     Mr. Lamson, did you send and receive the messages

Page 184

1  that are on this e-mail string?
2   A  Yes.
3   Q  And the bottom message says -- it's from
4  Mr. McKelvey, it says: "We're doing distributions with HI,
5  so tell us the cut. Otherwise, DJ will get the $10,000."
6     My assumption is that the "HI" actually refers to
7  Hidden Ladder, and "DJ" refers to David Johnson.
8   A  Correct.
9   Q  Did you have an arrangement with Mr. Johnson as
10 who how you would get paid?
11  A  How -- no. I didn't -- I don't think we had an
12 arrangement. I think it was just -- now, it was split 5, 5
13 is what the arrangement was.
14  Q  And was that an arrangement between you and
15 Mr. McKelvey?
16  A  No. It was an arrangement between -- it was an
17 arrangement between Mr. Johnson and myself.
18  Q  And you notified Mr. Lamson to -- I'm sorry --
19 Mr. McKelvey to split 5 and 5 and then gave your wife's
20 bank account information, correct?
21  A  Correct.
22  Q  And it also says: "Can send the money from my
23 work there also."
24     So you were instructing Mr. McKelvey to send
25 money from your work to your wife's bank account; is that

Page 185

1  correct?
2   A  Correct.
3   Q  Do you personally maintain any bank accounts?
4   A  I do.
5   Q  And is that at the Golden 1 Credit Union?
6   A  Yes.
7   Q  Why were you instructing for monies to be sent to
8  your wife as opposed to your account?
9   A  Probably because we were going to pay the house
10 bills out of that.
11  Q  And this is dated March 16th, 2011.
12     Do you recall receiving a payment of
13 approximately $5,000 into your wife's Bank of the West
14 account around that time?
15  A  I would assume it went there, but I don't -- I --
16 I mean, it doesn't stand out that I recall that, but I'm
17 assuming that it hit that account.
18  Q  Mr. Lamson, in response to the subpoenas, you did
19 produce some documents with respect to the Bank of the West
20 account, but just ones for the years 2012 and 2013.
21     What I'll do is go back and check the language of
22 the subpoenas --
23  A  Okay.
24  Q  -- to see in terms of -- part of it may have been
25 that it's a little subtle. That's why you may not have

Page 186

1  picked on the it. It's in terms of all documents related
2  to the companies could have also been bank statements which
3  reflect payments you received.
4       So what we may ask is for you to supplement in
5  terms of the Bank of the West bank statements that go back
6  to the time you where you received any payments with
7  respect to these companies.
8    A   Okay. That's --
9    Q   So I'll follow up with you in that respect.
10   A   I would say that I -- I thought from the
11 second -- the second thing, I thought I went through and
12 specifically did the dates that you asked for. I didn't
13 recall that we sent it to that account to be honest with
14 you.
15      If you would have asked me beforehand, I would
16 have said that all of them went to Golden 1, to be honest
17 with you, because that's probably where any of the -- most
18 of the payments for my work went. So ...
19   Q   Okay. As I said, what we'll do is, I'll check
20 the subpoenas to see if that -- those kind of documents
21 were asked for if, and if so, I may just ask you to
22 supplement in terms of those bank statements as well.
23   A   No problem, sir.
24   Q   If not, perhaps, I'll send you an additional
25 subpoena in that respect.

Page 187

1    A   Okay.
2    Q   Mr. Lamson, who is Jake Owens?
3    A   I don't recall the name.
4    Q   Is that an alias that you use?
5    A   I don't recall the name.
6    Q   Do you maintain an e-mail account
7  truck99WSU@gmail.com?
8    A   Not one that I maintain.
9    Q   Did you go to Washington State University?
10   A   I did.
11   Q   And are those initials "WSU"?
12   A   The -- yeah.
13      MR. COOK: If I could ask the court reporter to
14 mark as the next exhibit what's in Folder 44, please.
15      (SEC Exhibit No. 413 was marked
16      for identification.)
17      BY MR. COOK:
18   Q   Mr. Lamson, I've asked the court reporter to mark
19 as Mobile Vault Exhibit 413, it's a one-page e-mail
20 Bates-numbered Forte Capital 17205. It's an e-mail dated
21 June 30th, 2013, from Jake Owens to Daniel McKelvey.
22      Mr. Lamson, did you send this e-mail to
23 Mr. McKelvey?
24   A   I don't recall sending this e-mail to Daniel.
25   Q   Were you an investor in Blue Sun Media?

Page 188

1    A   I think I may have been.
2    Q   If you see Number 1, it says: "I'm assuming you
3  will take my accounting fee and that makes us square."
4       Did you write that to Mr. McKelvey?
5    A   I -- I don't know why I would say "Jake Owens" if
6  I wrote that to him, to be honest with you.
7    Q   Did you write this e-mail?
8    A   I -- I can't remember writing this e-mail.
9    Q   Look at Number 2. It says: "When are you going
10 to pay CEO fees: 6,000 to me, 4,000 to Elise?"
11      Does that refresh your recollection as to whether
12 you wrote this e-mail?
13   A   No. Because that -- I -- no. Because now I'm --
14 I've seen other e-mails that I haven't written. So ...
15   Q   Did Ms. Travertini have arrangements with anybody
16 else to split her CEO fee?
17   A   I -- I can't answer for -- I don't know what
18 arrangements she had with Tyler.
19   Q   The next line says: "I have not had much contact
20 with her, so can reach out to Tyler to see how she wants
21 her fee."
22      Did you write that statement to Mr. McKelvey?
23   A   Not from this e-mail, no.
24   Q   So your testimony is that you did not draft this
25 e-mail --

Page 189

1    A   Well --
2    Q   -- correct?
3    A   -- if it was from JL8387, I would have said that
4  I -- I may have asked those questions, or if it was from
5  one of my e-mail addresses, I would have asked -- I would
6  have said I -- I could have drafted that emails.
7    Q   Have you ever maintained an e-mail account
8  truck99WSU@gmail.com?
9    A   No. And I know that Daniel maintained e-mail
10 accounts. So I -- I don't -- no.
11   Q   So you have no recollection of sending this
12 e-mail that's been marked as Mobile Vault Exhibit 413?
13   A   I have no recollection of mailing -- of sending
14 that.
15      MR. COOK: If I could ask the court reporter to
16 mark as the next exhibit what's in folder 45, please.
17      (SEC Exhibit No. 414 was marked
18      for identification.)
19      BY MR. COOK:
20   Q   Mr. Lamson, I've asked the court reporter to mark
21 as Mobile Vault Exhibit 414, a two-page e-mail string
22 Bates-numbered Forte Capital 17197 to '17198. And it's
23 e-mail string dated July 2nd and July 3rd, 2013. It's an
24 e-mail string between Daniel McKelvey and a Jake Owens.
25      Mr. Lamson, are you familiar with this e-mail

Page 190

1 string?
2 A   I am reading it now. I know Daniel and I had
3 this conversation.
4         (Proceedings paused briefly)
5         THE WITNESS: I remember this -- this e-mail
6 conversation.
7         BY MR. COOK:
8 Q   So you sent and received the messages on this
9 e-mail string?
10 A   Yeah. But I -- once again, I don't -- I don't
11 maintain that e-mail address. So -- that's why I'm
12 confused.
13 Q   Do you recall what e-mail account you sent and
14 received these messages?
15 A   If it was a response to Daniel's, it's wherever
16 he sent that to, and so I -- no, I don't. It doesn't show
17 up like that on my -- on my account.
18 Q   Have you ever maintained any Gmail account?
19 A   I have a Gmail account for a company that I own.
20 Q   And what is the e-mail address for that account?
21 A   BC Oil Logistics.
22 Q   @gmail.com?
23 A   Yes.
24 Q   You have never maintained an e-mail account
25 truck99WSU@gmail.com?

Page 191

1 A   I -- I have not -- now, once again, if I
2 responded to something, I -- I have not maintained it. So
3 I don't -- I don't know who's maintaining it.
4 Q   But you were the party to this e-mail string with
5 Mr. McKelvey, correct?
6 A   Yes. I was the party.
7 Q   And if you see that the e-mail string begins with
8 a message -- it said from this Jake Owens account saying:
9 "Now please respond to my earlier e-mail regarding the
10 $3,500 owed to me for the CEO fee," and the subject is
11 "Blue Sun Media."
12      Did you have an agreement with Mr. McKelvey as --
13 with respect to your cut of the CEO fee for Blue Sun Media?
14 A   I think I told -- I told Mr. McKelvey I -- I was
15 pretty open with Mr. McKelvey about what the shares were
16 going to be for everybody involved.
17      I don't necessarily recall Blue Sun Media right
18 offhand.
19 Q   Mr. McKelvey writes back: "I will have to work
20 with you on the CEO fee because right now, Steve doesn't
21 like the plays with the CEOs and what he uncovered from
22 Marissa directly."
23      Do you understand the reference to "Steve" being
24 Steven Sanders?
25 A   Yes.

Page 192

1 Q   And do you understand "Marissa" to be
2 Marissa Watson?
3 A   Correct.
4 Q   Do you know what Marissa Watson said directly to
5 Mr. Sanders?
6 A   Nope.
7 Q   And Mr. McKelvey continues: "And the fact that
8 now there are two elements in question, it really gets to
9 be a problem."
10      Do you know what he meant by "two elements"?
11 A   No. I was very clear with them regarding
12 Marissa. So anything that -- I was very clear with -- like
13 I said, I haven't talked to Steve much; but I was very
14 clear when Marissa said that she did not -- no longer
15 wanted to be a part, I was very clear with Daniel regarding
16 that.
17 Q   And did Ms. Watson express to you her concerns
18 about staying part of BlueFlash?
19 A   Yes.
20 Q   And what were her concerns?
21 A   She just -- you know what? She just didn't like
22 the -- the -- didn't -- it didn't add up -- make sense to
23 her, and she didn't want to use her social security number.
24      She was worried about identity theft or something
25 like -- you know, whatever -- didn't even want to put her

Page 193

1 Social Security number out there, didn't like the phone
2 calls that came.
3      So she didn't want to be a part of it. Didn't
4 know Daniel. Didn't know Steve.
5 Q   Did she have contact with Mr. McKelvey or
6 Mr. Sanders?
7 A   She -- at some point she did, I think, with both
8 of them.
9 Q   Do you know how she obtained Mr. McKelvey's
10 contact information?
11 A   No. I think they contacted her. I think -- I
12 think they had her contact information, but I don't know.
13 I wasn't a party to any of that.
14 Q   The next paragraph says -- from Mr. McKelvey:
15 "Therefore, we need some assistance on the Falcon case.
16 Let me propose the following: I will pay the $3500 fee for
17 hours on the GDSI case. The standard rate is $75 per hour,
18 so 3500 equates to 47 hours of service from you."
19      What is the "Falcon case" that Mr. McKelvey is
20 referring to?
21 A   FLCN, the first company that we worked for.
22      He had a lawsuit going against -- against --
23 well, a lawsuit going against the CEO of that company, and
24 he wanted me to do some work for him on it.
25 Q   And what was the name of that CEO?

Page 206

1  the money and -- and the registration statements, you know,
2  whatever -- saying who --
3    Q  I just --
4    A  Sorry -- saying who -- you know, it's that yearly
5  filing sort of like you have in California with the
6  corporate fee. It was just a -- it was a fee and an
7  online -- online form.
8       MR. COOK: If I could ask the court reporter to
9  mark what's in Folder 43 as the next exhibit, please.
10       (SEC Exhibit No. 415 was marked
11        for identification.)
12  BY MR. COOK:
13    Q  Mr. Lamson, I've asked the court reporter to mark
14  as Mobile Vault Exhibit 415, it's a one-page e-mail with
15  Bates number SEC JLamson-106 with a pdf attachment,
16  'JLamson 107 to '112.
17       Mr. Lamson, is this an e-mail that you sent to
18  Daniel McKelvey on April 30th, 2013?
19    A  Yes.
20    Q  And per these vouchers, you made filings for
21  Big Clix Corp, ShopEye, Inc., Mobile Vault, Inc.,
22  BlueFlash Communications, Inc., Fansport, Inc., and
23  mLight Tech, Inc., correct?
24    A  I think I probably asked him if he wanted -- if
25  he wanted to make these.

Page 207

1    Q  And did you make these actual payments --
2    A  I --
3    Q  -- with respect to these companies?
4    A  I -- I'm saying probably 99 percent of them. I
5  don't know if one of them was sold or the timing of the
6  sale or whatever. But we did make payments to Florida for
7  all those every -- once a year.
8    Q  You were involved in Mr. McKelvey's companies
9  as -- at least, until April 30th, 2013, correct?
10    A  As a bookkeeper -- as a bookkeeper, yes.
11    Q  Did you also file tax returns for Mr. McKelvey's
12  companies?
13    A  I -- I didn't file them. I prepared them.
14       MR. COOK: If I could ask the court reporter to
15  mark what's in Folder 42 as the next exhibit, please.
16       (SEC Exhibit No. 416 was marked
17        for identification.)
18       THE WITNESS: Then I would send them to
19  Mr. McKelvey.
20       BY MR. COOK:
21    Q  Mr. Lamson, I've asked the court to mark as
22  Mobile Vault Exhibit 416, a one-page e-mail from -- e-mail
23  string between you and Daniel McKelvey dated April 17,
24  2013. Mr. Lamson, did you see -- send and receive
25  the e-mails in this string?

Page 208

1    A  Yes.
2    Q  And what is Big Clix?
3    A  It's -- I think I did a tax return for Big Clix,
4  one of Daniel's companies, as his bookkeeper. I did the --
5  I dropped it into TurboTax.
6    Q  The e-mail here says -- the subject "Big Clix"
7  dated April 17th, it says: "Filed both fed and Florida and
8  California."
9       Was this in reference to tax returns?
10    A  Yes.
11    Q  So you both drafted and filed tax returns on
12  behalf of Big Clix, correct?
13    A  Well, after -- after Daniel took care of -- I
14  drafted them, sent them to Daniel. He would send them back
15  to me for filing on some of them.
16    Q  Did Mr. McKelvey make any changes or additions to
17  the tax return drafts that you sent him?
18    A  If he had changes or additions, he would get
19  signatures, and if he had changes or additions he would --
20  ask me to make the changes and resend.
21    Q  Mr. Lamson, you testified that you both did
22  accounting and bookkeeping work for Mr. McKelvey's
23  companies and recruited CEOs.
24       Did you perform any other functions for which you
25  were compensated?

Page 209

1    A  Other than the bookkeeping part and the -- and if
2  I -- if I did something like this, I would -- if I did a
3  tax return for him, I would get a stipend for a tax return.
4    Q  Do you remember how you were paid --
5    A  Umm --
6    Q  -- for the tax return work?
7    A  I don't know if it was checks or not, I don't
8  know.
9    Q  Mr. Lamson, do you recall directing payments for
10  your work to your wife?
11    A  She was set up as a vendor in there. So it was
12  just easier sometimes to do that.
13    Q  Why did you set up your wife as a vendor if you
14  were the one providing the services?
15    A  I don't know. It didn't matter to me.
16    Q  Well, why didn't you put yourself if you did the
17  work?
18    A  It's -- I didn't really think about it.
19    Q  Did your wife perform any functions for
20  Mobile Vault?
21    A  No.
22       MR. COOK: If I could ask the court reporter to
23  mark as a composite exhibit what's in Folder 48, please.
24       (SEC Exhibit No. 417 was marked
25        for identification.)

Page 210

1  BY MR. COOK:
2  Q  Mr. Lamson, I've asked the court reporter to mark
3  as the next exhibit and hand to you Mobile Vault
4  Exhibit 417 as a composite exhibit. It's some one-page
5  sheets with Bates numbers SEC-ZBS, and the first page
6  is '571, and the last page is '2534. It's seven pages,
7  total.
8      Mr. Lamson, have you ever seen these
9  reconciliation details before?
10  A  Umm, I don't know if I -- I don't know. I -- I'm
11  sure I had access to them.
12  Q  Do you see a number of times on these pages there
13  are -- your wife's name appears?
14  A  Yes.
15  Q  And do you know why your wife's name appears in
16  connection with Mobile Vault?
17  A  She was set up as a -- she was -- originally, was
18  set up as the vendor. So when we carried over or we did
19  new companies, it just carried over with it, and that's
20  what I -- I just left it at. I didn't change it.
21  Q  And when was she originally a vendor?
22  A  Well, I -- I think it was originally with --
23  originally with -- she was set up as -- in the
24  Teaching Time. Her name was set up.
25  Q  Was she a vendor for Teaching Time?

Page 211

1  A  Not a vendor. But she was set up as a person
2  they were paying bills to in QuickBooks. Vendor maybe is a
3  bad -- so I just -- we just left it at that.
4  Q  So its totally inadvertent that your wife was
5  left there?
6  A  Yeah. You know what? Those are -- those are
7  stuff that -- that I got paid for. We have joint checking
8  accounts. So I wasn't worried about changing it.
9  Q  But, Mr. Lamson, you were a CPA, correct?
10  A  Correct.
11  Q  And as a CPA, there are various responsibilities
12  to keep accurate books and records, correct?
13  A  Correct.
14  Q  And is it false and misleading to represent your
15  wife as a vendor of Mobile Vault?
16  A  I don't -- I don't think it's false and
17  misleading.
18  Q  Did you specifically direct Mr. McKelvey to pay
19  you for your work through your wife?
20  A  I don't know if we had that discussion.
21  Q  Well, I'd turn your attention back to
22  Mobile Vault Exhibit 412, please.
23     You direct Mr. McKelvey to send your CEO fee to
24  your wife, and you also say to "send the money for my work
25  there, also," correct?

Page 212

1  A  Correct.
2  Q  Were you trying to hide your involvement in these
3  companies from anyone?
4  A  No.
5  Q  Why does your name not appear as the vendor for
6  those companies if you were the one providing the services?
7  A  I don't know. I didn't -- you know what? To be
8  honest with you, I wouldn't have thought it was a big deal.
9  Q  Well, do you realize that these invoices were
10  sent to auditors for these entities to provide opinions as
11  to the financial statements of the companies?
12  A  Yeah. And the work was performed. And it
13  wasn't -- it wasn't -- it wasn't in the -- in the capacity
14  of a CPA. So, you know.
15  Q  Was it performed by your wife?
16  A  No. It was performed by me.
17  Q  And early on, didn't Mr. McKelvey tell you not to
18  appear on documents for these companies, that it would,
19  otherwise, look fishy?
20  A  I don't know how early on that was, and I
21  don't -- so I don't -- and I wouldn't have considered this,
22  those documents. I thought it was more related to, you
23  know, he didn't want me to be included on -- with the
24  bank -- with banks.
25     And that's why when he puts me as assistant

Page 213

1  secretary, it sort of surprised me because, at that point,
2  I assumed he didn't want me anywhere around those things.
3     MR. COOK: If I could ask the court reporter to
4  mark as the next exhibit what's in Folder 49, please.
5     (SEC Exhibit No. 418 was marked
6     for identification.)
7     BY MR. COOK:
8  Q  Mr. Lamson, I've asked the court reporter to mark
9  as Mobile Vault Composite Exhibit 418 a series of invoices.
10 The first page is Bates-numbered SEC L&A 10222.
11    And the last page is -- 11 pages -- SEC L&A 1742.
12    Mr. Lamson, did you prepare these invoices?
13 A  Yes, I did.
14 Q  And did your wife perform any services for
15 BCS Solutions?
16 A  I performed them.
17 Q  Did your wife perform -- if you look at the
18 second page, SEC L&A 10223, were you paid $7,000 for
19 financial services in connection with BCS Solutions?
20 A  I don't know if I was.
21 Q  Did your wife perform any financial services for
22 BCS Solutions?
23 A  No.
24 Q  Did your wife perform any financial services for
25 Hidden Ladder?